**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD GESLICKI,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 8359 |
| | ) | |
| v. | ) | Magistrate Judge Cole |
| | ) | |
| **CAROLYN W. COLVIN**[1]**, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Richard Geslicki, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying him Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Mr. Geslicki asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**

**PROCEDURAL HISTORY**

Mr. Geslicki applied for DIB on October 26, 2010, 2009, alleging that he became disabled as of October 22, 2010, due to cerebral palsy, osteoarthritis, and deafness. (R. 146-152, 167, 169). His application was denied initially and on reconsideration, and he requested an administrative hearing. An administrative law judge ("ALJ") convened a hearing on May 17, 2012, at which Mr. Geslicki, represented by counsel, appeared and testified. In addition, Dr. Ashok Jilhewar testified

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

as a medical expert, and Linda Gels testified as a vocational expert. (R. 30-78). On April 12, 2010, the ALJ issued a decision finding that, despite suffering from severe impairments – cerebral palsy, degenerative disease of the hips, bilateral hearing loss (R. 18) – Mr. Geslicki was not disabled.

The ALJ concluded that Mr. Geslicki had the residual functional capacity ("RFC") to perform a range of sedentary work that was pared down by a number of additional limitations: he could not sit for more than two hours in a row; he could not stand or walk for more than two hours a day total, and for no more than 30 minutes at a time; he could not push or pull more than ten pounds with his right leg more than occasionally; he could not climb ladders, ropes, or scaffolds; he could not climb ramps more than frequently; he could not climb stairs, balance, stoop, bend, kneel, crouch and crawl more than occasionally; he had to avoid exposure to unprotected heights and excavations; he could not use a telephone; he could only hear and understand conversational tones at a distance of 6 to 10 feet with a hearing aide. (R. 19). This RFC allowed him to return to his past relevant work as a small parts assembler. (R. 16-24). This became the final decision of the Commissioner when the Appeals Council denied Mr. Hobbs's request for review of the decision on October 20, 2013. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Geslicki has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## THE EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Geslicki was born on December 5, 1965, making him forty-four years old at the time of

the ALJ's decision. (R. 34). He has a high school education from a high school for the disabled. (R. 36, 49). He has lived with his mother his whole life. (R. 35). From 2005 to 2010, he worked in electronics assembly, which was sedentary work requiring lifting of no more than 10 pounds. (R. 179, 188). Prior to that, he worked as an electronic door opener assembler from 1992 through 2004. (R. 179, 189). He had to quit working in October 2010 because of problems with his hip and back. (R. 37). He had surgery for that but did not recover sufficiently to return to his electronics assembly work. (R. 40).

**B.**

**The Medical Evidence**

On September 3, 2010, Mr. Geslicki saw Dr. Bruce Bernheim, who noted that he had progressive pain and debilitation of both hips, with the problem in the left hip being far worse. There was also right-side hemiparesis due to cerebral palsy. Mr. Geslicki was "functioning at a high level" but was "becoming significantly more debilitated . . . ." Examination revealed "significant tightness in both hips, more so on the right side." There were significant flexion contractures bilaterally. The right leg was atrophied. (R. 278). X-rays demonstrated advanced osteoarthritic changes in both hips. (R. 278-79). Dr. Bernheim felt that a left hip replacement was indicated – Mr. Geslicki had more pain on that side – but that the ride side atrophy ruled out a replacement on that side. (R. 279).

On September 15, 2010, Dr. Alexander Gordon reported that Mr. Geslicki was suffering from "progressive pain associated with debilitation regarding advanced osteoarthritis of both hips." This condition was apparently worse in the left hip, as the doctor indicated that Mr. Geslicki was going to have to have a left hip replacement. (R. 277). Mr. Geslicki had the procedure in November 2010.

3

(R. 477-92).

Dr. David Bitzer reviewed the record on behalf of the state disability agency on January 13, 2011, and concluded that Ms. Geslicki could perform light work including standing or walking for 6 hours of every workday. Mr. Geslicki was capable of climbing ramps and stairs frequently, but only occasionally balancing, stooping, kneeling crouching, or crawling. (R. 497-98). This was a "projected" RFC – it was assumed that Mr. Geslicki would recover from surgery and reach the sated capacity within 12 months. (R. 503).

On January 25, 2011, Dr. Gordon reported that Mr. Geslicki was doing well three months after left hip replacement surgery. X-rays of the left hip showed the replacement was well positioned. Mr. Geslicki was walking without an assistive device and really had no pain. (R. 511).

The state disability agency arranged for Mr. Geslicki to have a consultative examination with Dr. Jeffrey Ryan on February 26, 2011. Dr. Ryan noted that Mr. Geslicki suffered from cerebral palsy and that his right leg was shorter than his left. He also noted that Mr. Geslicki had had a left hip replacement in November of 2010 with subsequent rehabilitation. He was suffering from persistent pain on the right side but was waiting until further deterioration to undergo surgery there. (R. 517). Mr. Geslicki had no difficulty understanding normal speech with his hearing aid. Both hips were tender to palpitation. Flexion was limited to 90 degrees. There was limitation bilaterally in abduction, adduction, and rotation bilaterally, more so in the right hip. (R. 518-19). Gate was significantly antalgic. He was unable to heel/toe walk, squat, or rise from a seated position. He had no difficulty getting on and off the exam table. (R. 519).

On March 11, 2011, Dr. Vidya Midala reviewed the record on behalf of the state agency and concurred with the earlier determination from Dr. Bitzer. (R. 528).

4

A consultative hearing exam on March 15, 2011, revealed severe hearing loss in the left ear and a mild to profound loss in the right ear depending on the frequency. (R. 531).

On May 3, 2012, Dr. Gordon reported that Mr. Geslicki could sit for no more than 5 hours a day and stand for no more than 1 hour. He could lift 10-20 pounds. (R. 573). Similarly, Dr. Bernheim reported on May 4, 2012, that Mr. Geslicki was limited to 4 hours of sitting and 1 hour of standing or walking in an 8-hour workday. Again, he could lift 10-20 pounds. (R. 571).

## C.

## The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

Mr. Geslicki testified that he didn't think he could sit and do his assembly job any more due to pressure on his hips. (R. 51). He thought he might be able to sit for 3 or 4 hours, but not a whole day. (R. 51). Once he sat for about an hour, his hip got stiff, and he would have to get up and walk around. His right hip was "unyielding." (R. 52). There was also some kind of muscle tension in his left leg. (R. 52).

Mr. Geslicki said he lived with his mother and tried to help her around the house – doing dishes, cooking, vacuuming, sweeping. (R. 44). He also liked to visit his brother and sister who lived within walking distance. (R. 44-45). He could walk only one to three blocks before he had problems. (R. 45). He mowed the small lawn in front of the house once in a while, and shoveled snow if it wasn't too deep – his brother would help him. (R. 45). Other than that he watched television. He did that lying down, because he was unable to sit for very long. (R. 46, 54). He had difficulty getting in and out of the tub and had to use a small stepstool. (R. 48).

## 2.

### The Medical Experts' Testimony

Dr. Jilhewar then testified as a medical expert. He recounted the evidence pertaining to Mr. Geslicki's various impairments. The doctor said none of Mr. Geslicki's impairments, either singly or in combination, met a listed impairment. (R. 60-61). He rejected the opinions of Mr. Geslicki's two treating physicians, saying he could not understand why Mr. Geslicki would not be able to work forty hours a week. He felt the doctors had noted no abnormalities that would account for him not being able to do so. (R. 62). Dr. Jilhewar opined that Mr. Geslicki could do sedentary work – lifting and carrying ten pounds occasionally – because there was no documentation of any stiffness or pain "in the hip." (R. 62). Mr. Geslicki could walk or stand for thirty minutes at a time or a total of two hours a day. Dr. Jilhewar added a number of postural limitations: he could walk on ramps frequently; stairs occasionally; balancing, stooping, bending, kneeling, crouching, and crawling occasionally; he couldn't work on the phone or on ladders, ropes, scaffolds, or at unprotected heights. (R. 63).

## 3.

### The Vocational Expert's Testimony

Finally, Ms. Gels testified as a vocational expert. She testified that Mr. Geslicki's work history was, broadly, small products assembler. (R. 67-68). His work as a door opener assembler was unskilled and light and may have been medium as he performed it. (R. 68-69). Ms. Gels had no Dictionary of Occupational Titles ("DOT") reference number for the job. (R. 68). Regionally, in Illinois, it was a light level job. (R. 69). She didn't know how many such jobs were in the region, but general, small products assembly jobs numbered 4000. (R. 69).

The other small assembly job – at Skillcraft – that Mr. Geslicki performed was "somewhere between sedentary and light" the way he performed it, and it was at the "low end of semiskilled." (R. 71). Ms. Gels said there were a range of possibilities for categorizing the work in the DOT – from unskilled to semiskilled and ranging from sedentary to light. (R. 71). At the sedentary level, Ms. Gels thought there might be 1200 positions like that regionally. (R. 72).

Given the capacity that Dr. Jilhewar testified to – sedentary with 30 minutes of standing or walking at a time – Ms. Gels thought that Mr. Geslicki could perform his past work at Skillcraft as he described it on his written form. (R. 75). The capacity Mr. Geslicki's physicians found him to have would not allow for any type of work. (R. 75-76).

### D.

### The ALJ's Decision

The ALJ found that Mr. Geslicki suffered from the following severe impairments: cerebral palsy; degenerative disease of the hips, and bilateral hearing loss. (R. 18). The ALJ next determined that he did not have an impairment or combination of impairments that met or equaled a listed impairment, focusing specifically on listing 1.02, pertaining to dysfunction of joints, 2.08, covering hearing loss, and 11.07, covering cerebral palsy. (R. 18-19). The ALJ went on to determine that Mr. Geslicki had the residual functional capacity to perform a range of sedentary work with several additional limitations: he could not sit for more than two hours in a row; he could not stand or walk for more than two hours a day total, and for no more than 30 minutes at a time; he could not push or pull more than ten pounds with his right leg more than occasionally; he could not climb ladders, ropes, or scaffolds; he could not climb ramps more than frequently; he could not climb stairs, balance, stoop, bend, kneel, crouch and crawl more than occasionally; he had to avoid exposure to

7

unprotected heights and excavations; he could not use a telephone; he could only hear and understand conversational tones at a distance of 6 to 10 feet with a hearing aide. (R. 19).

The ALJ determined that Mr. Geslicki was not "fully credible," using the familiar – and meaningless – boilerplate that has been criticized by the Seventh Circuit repeatedly. (R. 20). He based his credibility finding on the medical evidence and Mr. Geslicki's daily activities. (R. 20-23). The ALJ accepted the testimony of the medical expert, Dr. Jilhewar, and rejected the opinions of Mr. Geslicki's treating doctors, because, he concluded, they were not consistent with the medical record or their own notes. (R. 22-23). He then relied on the vocational expert's testimony to find that Mr. Geslicki had the capacity to return to his past small electronics assembly work as Mr. Geslicki described it and as it was generally performed in the region. (R. 23). Therefore, the ALJ found him not disabled under the Act. (R. 23-24).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008);

*Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The court has also assured that it is a "lax" standard, *Berger*, 516 F.3d at 544.

## B.

### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments

9

listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Mr. Geslicki has three problems with the ALJ's decision: First, he argues that the ALJ improperly rejected the opinions of his treating physicians. Second, that the ALJ's credibility determination was flawed, and third, that the ALJ's determination that he could perform his past work is not supported by the evidence.

### 1.

The ALJ rejected the findings of Mr. Geslicki's treating physicians because, according to the medical expert, they were not supported by clinical evaluation and were inconsistent with clinical notes. The opinions of treating physicians are generally entitled to controlling weight, if they are supported by acceptable clinical and diagnostic evidence and are consistent with the medical record.

*Thompson v. Colvin*, 575 Fed.Appx. 668, 676 (7th Cir. 2014); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir.2010). If an ALJ rejects a treating source's opinion, he must provide good reasons for doing so. *Yuri v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

Ostensibly, the ALJ offered a valid reason for rejecting the two doctors' opinions here. But, the reason is not supported by the record. Both the ALJ and the medical expert appear to have focused on notes regarding the progress of Mr. Geslicki's left hip replacement. (R. 22-23, 62, 64). For that matter, the two state agency reviewing physicians did, too. There was still the matter of the severe arthritis in Mr. Geslicki's right hip, which was confirmed by x-ray, his treating doctors' notes, and his consultative exam with Dr. Ryan. That would certainly seem to be the kind of clinical evidence and findings the medical expert and the ALJ were (or should have been ) looking for.

The medical expert stated, at one point that Mr. Geslicki had surgery on his left hip but not his right hip because he had no pain on his right side. (R. 58). That's simply not true. Mr. Geslicki's physicians both reported that, while his left hip was worse than his right, he had progressive and debilitating pain in *both* hips. (R. 277-79). Surgery on the right hip was ruled out due to the atrophy of his left leg, not because he was pain-free there. (R. 277). The documentation the medical expert cites for his theory – Exhibit 4F, page 73 – does not say Mr. Geslicki has no pain in his right hip; it doesn't even mention his right hip because it is a post-operative report on his left hip replacement. (R. 367). Moreover, the medical expert did not note any of the findings regarding Ms. Geslicki's right hip. (R. 61). The right hip was nearly as problematic as the left, and it presents support for the treating doctors' determinations regarding Mr. Geslicki's limitations in sitting, standing and walking. Moreover, due to right leg atrophy, the right hip problem was inoperable, and

thus, it wasn't going to get better.

In sum, the reason the ALJ gave – and the medical expert gave – for rejecting the opinions of not one, but two treating physicians is not consistent with the record. Accordingly, this matter must be remanded to the Commissioner. While we need go no further, it is worthwhile to address some additional points.

**2.**

The ALJ found Mr. Geslicki not credible and, in doing so, seemingly could not help but employed the meaningless boilerplate that the Seventh Circuit has denounced time and again. *See Moore v. Colvin*. 743 F.3d 1118, 1122 (7th Cir. 2014)("We have repeatedly condemned the use of that boilerplate language because it fails to link the conclusory statements made with objective evidence in the record."); *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir.2012)("It puts the cart before the horse, in the sense that the determination of capacity must be based on the evidence, including the claimant's testimony, rather than forcing the testimony into a foregone conclusion."); *Bjornson v. Astrue*, 671 F.3d 640, 644–46 (7th Cir.2012)("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)("It is not only boilerplate; it is meaningless boilerplate.").

Despite rant after rant from the court, the phrasing continues almost perversely to habitually appear in ALJ's decisions. "The continued efforts of the Court of Appeals to eliminate this flawed phrasing and reasoning are reminiscent of Hercules's Second Labor with the Lernaean hydra. See APOLLODORUS, THE LIBRARY 189 (Sir James George Frazer trans., G.P. Putnam's Sons 1921) ("Nor could he effect anything by smashing [the hydra's] heads with his club, for as fast as one head was smashed there grew up two.")." *Hughes v. Colvin,* 2015 WL 2259833, 15 (N.D.Ill..2015).

12

While illogical reasoning can have no legitimate purpose, in at least one case before the Seventh Circuit, the Commissioner nonetheless vainly tried to defend it as "an indispensable aid to the Social Security Administration's overworked administrative law judges." But not even the Commissioner's lawyers know what the boilerplate or template means. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "One begins to suspect that ALJs perversely trot out the phrase simply to vex the Seventh Circuit." *Wilcox v. Colvin,* 2015 WL 135441, 3 (N.D.Ill. 2015). "And so, given this perversity and intransigence, it is perhaps hard to fault lawyers whose briefs are equally intransigent in relying on the ALJs' resort to the boilerplate." *Mason v. Colvin* 2014 WL 5475480, 12 (N.D.Ill.2014).

Still, the boilerplate is not necessarily toxic. Indeed, it seldom is. If the ALJ follows it up with some rationale for rejecting a claimant's testimony, there is no reversible error. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir.2013); *Filus*, 694 F.3d at 868. The ALJ did that here: he indicated that he didn't believe Mr. Geslicki based on the objective medical evidence and his daily activities. But there are a couple of problems there as well.

In addressing Mr. Geslicki's daily activities, the ALJ wrote:

> The claimant wrote in a function report that he showers, eats meals, exercise [sic] and performs physical therapy as well as reads. The activities that the claimant performs are consistent with activities that an individual would perform in a limited light exertional activities [sic] and would be consistent with the activities found in sedentary work activities.

(R. 23). This reasoning flies in the face of a long line of Seventh Circuit precedent chastising ALJs for equating the ability to perform a few sporadic activities at home with a capacity for holding down

13

an 8-hour-a-day, 5-day-a-week, full-time job. The court may have put it most explicitly in *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012):

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

671 F.3d at 647. *See also Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014)(". . . we have long bemoaned, . . . administrative law judges . . . equating] the ability to engage in some activities with an ability to work full-time, without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation."); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013)("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time.").

The ALJ clearly ignored the distinction between full-time work and limited activities. It is apparent from Mr. Geslicki's testimony that the few chores he may do he does not do on his own. He said he helps his mother or gets help from his brother. The rest of the day he spends reclining because sitting normally cause pain and stiffness in his hips. The specific activities the ALJ mentioned seriously undermine the ALJ's credibility assessment. Stepping into a shower even once a day for a few minutes does not equate to work or the capacity to engage in full time work.

Importantly, Mr. Geslicki testified that he even had trouble doing that – he had to use a stepstool to navigate the side of the tub. Mr. Geslicki's continued participation in physical therapy would seem to bolster, not detract, from his credibility. *Cf. Murphy v. Colvin*, 759 F.3d 811, 816 (7th

Cir. 2014)(ALJ may question a claimant's credibility if he or she fails to follow a prescribed course of physical therapy); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004)("The weight the administrative law judge gave to [claimant's] ability to walk two miles was perverse: not only is it a form of therapy, but it is not a form of therapy available at work."). Worst of all was the ALJ seemingly equating an ability to eat with an ability to work full-time. That bit of illogic falls into the category of mind-boggling.

That leaves the ALJ's one other reason for discounting Mr. Geslicki's complaints: the medical evidence. That's another problem. In the Seventh Circuit, the medical evidence cannot be the sole reason for finding a claimant not credible. *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014); *Moore*, 743 F.3d at 1125; *Pierce*, 739 F.3d at 1050. As the ALJ's credibility finding cannot stand on that single leg, it cannot be affirmed, and this matter must be remanded for this reason as well.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [Dkt. #13] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/22/15